# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 13, 2013

## DERRICK JOHNSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 05-09509      Chris Craft, Judge

---

**No. W2012-02577-CCA-R3-PC  - Filed November 27, 2013**

---

A Shelby County jury convicted the Petitioner, Derrick Johnson, of first degree murder and aggravated assault. The trial court imposed a life sentence for the first degree murder conviction, with a consecutive six-year sentence for the aggravated assault conviction, to be served in the Tennessee Department of Correction. The Petitioner appealed, and this Court affirmed the judgments of the trial court. *State v. Derrick Johnson*, No. W2008-02070-CCA-R3-CD, 2010 WL 3623619, at *10 (Tenn. Crim. App., at Jackson, Sept. 20, 2010) *perm. app. denied* (Tenn. Feb. 17, 2011). The Petitioner filed a petition for post-conviction relief, which the post-conviction court denied after a hearing. On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because he received the ineffective assistance of counsel. After a thorough review of the record and applicable law, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Robert C. Brooks, Memphis, Tennessee, for the appellant, Derrick Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Amy P. Weirich, District Attorney General; Stephanie Johnson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Facts
### A. Trial

This case arises from the shooting death of the victim, Eric Mattison. Based on the Defendant's role in the shooting, a Shelby County grand jury indicted the Petitioner for first degree murder and aggravated assault. On direct appeal, this Court summarized the underlying facts of the case as follows:

The facts of the case, in large part, are not in dispute. [The Petitioner] concedes that he shot and killed the victim, Eric Mattison; however, [the Petitioner] contends that it was in self-defense. In short, [the Petitioner] and the victim had an altercation the day before the offense because [the Petitioner] was apparently blocking neighborhood traffic. The next day, the day of the offense, [the Petitioner] saw the victim again and maintained, based on events that occurred the day before, that the victim attempted to shoot him. Consequently, [the Petitioner] retrieved a firearm and shot at the victim and his girlfriend. The following detailed proof was presented at trial.

Rene Mattison, the victim's mother, testified that the victim lived with her prior to his death. She confirmed that on July 19, 2004, the victim was shot and died a few days later as a result of his injuries.

On the morning of the offense, Patricia Turnmire, a crime scene officer with the Memphis Police Department, responded to 4164 Kostka at the Lakeside Down Apartments in Memphis, Tennessee. Upon arrival she was advised that there had been a shooting and the victim had already been transported to the hospital. She observed the victim's vehicle, a white Oldsmobile Intrigue, and stated that it was heavily damaged. She described the vehicle as having been struck several times by gunfire. She, along with her partner, collected numerous .45 caliber shell casings and a few bullet fragments. Although a .25 caliber handgun was recovered from inside of the vehicle, there were no shell casings from this type of weapon recovered from the scene. Turnmire also noted what appeared to be blood inside of the vehicle. At a minimum, Turnmire stated the vehicle had been shot into eight (8) times. Both airbags deployed. The back windshield had been shot out. She recalled finding the .25 caliber handgun in inoperable condition.

On the morning of the offense, Kimberly Mayes, the victim's girlfriend of eight years, drove him to a friend's house in the Lakeside Down Apartments. Upon arrival, they did not see the friend's car and realized the

friend was not there. When Mayes "backed up to leave," she saw [the Petitioner], whom she only knew as ["Dirty D."] "He was like at the edge of the garbage can, pointing a gun at [her] car. He began shooting in [her] car." Mayes tried to duck and drive her vehicle; however she hit another parked vehicle with children in it.

After Mayes wrecked her vehicle, [the Petitioner] continued to shoot. Mayes said the victim "jumped out [of] the car over [her] on the driver's side out the door." She stated that at this point, she had not been shot and did not believe the victim had been shot. She also stated that the victim did not have or shoot a weapon. When she got out of the vehicle, she saw the victim lying on the ground and went to get help. She attended the victim's funeral two days later.

Mayes stated that she knew [the Petitioner] "from around ... the neighborhood. [They] all grew up in the same neighborhood." Mayes spoke with the police that day and identified a photograph of [the Petitioner] as the person who shot the victim. Mayes was shown a photo array at the police station the next day and again identified [the Petitioner] as the perpetrator of the offense.

The day before the victim was killed, Mayes and the victim were at his mother's home. Mayes recalled that [the Petitioner] was "blocking the street trying to talk to some young lady ... and [the victim] asked him to move the car out of the way[.]" [The Petitioner] would not move and the victim got out of their vehicle and approached [the Petitioner's] vehicle. Mayes stated, "They had little words-not even a big argument about blocking the way. I got out of the car. I was like, 'What's going on?' He replied to me, 'There's nothing going on. You don't have to worry about anything. I'm not going to get myself killed over anything.'" She described the encounter as "nothing" and stated they left afterwards.

On cross-examination, Mayes denied seeing Jackie Guy or conducting a "transaction" with her on the morning of the killing. She said she took the victim's money, approximately $700, and his watch from his person after the shooting. However, when confronted with a statement she had previously given to the police, she clarified that she was "leaving from . . . in front of Jackie's house" and that she initially told the police that she did not take anything from the victim's person. She explained that she "wasn't thinking" at the time she gave the statement.

3

Lieutenant Doreen Shelton testified that on the day of the offense she was working as a sergeant with the Memphis Police Department Homicide Bureau. She responded to the crime scene and observed that the gun recovered from the victim's vehicle "had a double seed, meaning that possibly the weapon had one round already in the chamber ready to fire, and the person jacked the weapon-pulled the slide back very fast, which caused another round to go up, but the ejection pin did not eject the first round for some reason, and it just would not operate that way." She was also part of the team that interviewed [the Petitioner] following his arrest on November 20. She explained that [the Petitioner] completed an advice of rights form and gave a written statement "basically confess[ing] to the shooting." The statement was in question and answer format and provided, in pertinent part, the following:

QUESTION: On Monday, July 19th, 2004, Eric Mattison was shot and killed at 4164 Kostka. Are you the person responsible for his death?

ANSWER: Yes, ma'am.

QUESTION: What did you use to kill Eric Mattison with?

ANSWER: A black handgun-.45.

QUESTION: How many shots did you fire at Eric Mattison?

ANSWER: I think it was nine. There was one in the chamber and eight in the clip because the gun was empty.

QUESTION: Do you know where, on Eric Mattison's person, that he was hit?

ANSWER: No, ma'am.

QUESTION: What did you do with the gun after this incident?

ANSWER: I passed it off to a junkie.
....

QUESTION: In your own words, tell me what happened before, during, and after the shooting.

4

ANSWER: On the 18th of July, I was riding through the Brookwood Apartments with one of my partners by the name of Keith Dear, and I stopped to talk to a girl, and a car pulled up. It was a white Alero, and the girl asked me would I move and let her by. So, I had told them that I would move, but the person who was in the car with her stuck his head around her head and started talking crazy like I needed to move out of the mother-fucking way.

So I realized who it was, so I told him to 'Stop playing, Little E'; and he was like, 'I ain't playing with you, bitch-ass nigger. I told you to move that shit out of the way.' So, I pulled the car up, turned around to leave the apartments, he jumped out of the car from the passenger side, and he was telling his girl to pop the trunk, but she wouldn't pop the trunk, so he went around to the driver's side and popped it himself.

When he popped the trunk, he had a gun in his hand. I don't know what kind it was, but it looked like a nine or a .380. He told me I needed to get my bitch-ass . . . up out of the apartments.

So, another van pulled up on my driver's side and asked, him, 'What is up, cuz?' He was like, 'Man, this bitch-ass n[] needs to get up out of the apartment, and he needs to leave now.' He was like, 'You need to leave right m[]-f[] now.' So, we left, me and the car that was following me, which was Keith Dear. He was driving a white '90 Fleetwood. He left the apartments and went to the Oakshire Apartments, and we like chilled out for a minute or two later on that day.

I had went to the Colonial Apartments on Airways, and as I was leaving the apartment, some shots were fired, and they chased me down Airways. I has-has [sic] ran the light. I has-I has [sic] went to Bethel Grove on Lamar and Sims to my uncle's house for the rest of the night.

The next morning, which was the 19th of July, I has went [sic] to the Lakeside Downs Apartments, and I had got dropped off and was supposed to be over at a girl's house, but she wasn't

5

home at the time. So, I sat on the stairs in front of her house. Then I saw a white Alero pull in, and he seen me sitting on the steps. He pulled up a gun and pointed it at me, so I ran around the corner and got a gun from somebody. By the time I came back, the car was coming, so I started shooting at the passenger, and she pulled off and hit a truck-an SUV.

When she hit the SUV, I ran back up and fired more shots and ran. I ran into another one of my partner's mother's house and told them, 'I think I killed somebody.' We had went to the Southern Hills Apartments and I gave the gun to a junkie and told him to get rid of it.

....

QUESTION: What time of day did Eric confront you on July 18th, 2004?

ANSWER: It was daytime, somewhere like 4:00 o'clock P.M.

....

QUESTION: How far away were you from the vehicle [the victim] was in when you shot the .45?

ANSWER: I was right up on the car.

....

QUESTION: Describe exactly what the white vehicle that the victim was in was doing when you opened fire.

ANSWER: They was speeding around the corner as if he was going to let off some shots or something and keep going. So, I pulled my gun out that I got from my friend and started shooting at the passenger, which was Eric.

....

QUESTION: When you saw Eric pull into the apartments, why did you go get a gun?

ANSWER: Because I know that he would do something crazy and try to kill me.

Francis Carpenter, a retired crime scene unit investigator, testified that he processed the vehicle in this case. He stated that he recovered five

6

projectiles or parts of bullets that actually hit the vehicle.

Special Agent Cervinia Braswell, a forensic scientist with the Tennessee Bureau of Investigation (TBI), testified as a firearms and ballistics identification expert. She analyzed the .25 caliber handgun recovered from the victim's vehicle. She stated, "the bullets from this gun . . . did not fire the bullets that I have because the land and groove measurements and the bullets themselves are not compatible." She explained that the bullets she received were compatible with a ".45 auto bullet." Agent Braswell received six bullets or bullet fragments to examine and testified that four of them were an exact match. Of all the items Agent Braswell examined, none were consistent with being shot from a .25 caliber handgun.

On cross examination, Agent Braswell stated that she was not asked by the State to conduct a fingerprint analysis on the .25 caliber handgun recovered from the victim's vehicle. She further explained that the .25 caliber handgun was in operable condition upon receipt. Although she could not conclusively determine if two of the projectiles recovered from the crime scene were fired from the .25 caliber handgun, she clarified that it "could have been fired from that gun." Finally, she did not know whether the victim's hands were "bagged" for gunshot residue testing.

The Memphis and Shelby County Chief Medical Examiner also testified, reviewed the autopsy report, and determined the victim's cause of death to be "multiple gunshot wounds, and the manner of death is homicide." She detailed the victim's wounds as follows: "There is noted a gunshot wound on the right side of the chest. Another gunshot wound on the left side of the back. And these two wounds are actually connecting wounds. That is they resulted from a bullet that entered on the right side of the chest and exited on the back of the left side of the chest." She also noted a gunshot wound just above the right knee and another gunshot wound on the victim's left side of his forehead. Finally, she explained that a toxicology report determined that the victim had breakdown products of marijuana and cocaine in his blood.

On cross-examination, the Medical Examiner stated that the injury to the chest involved "several vital organs, and in and of itself would have been a fatal wound." She stated the autopsy report did not include any notations indicating that the victim's hands were bagged for gunshot residue testing. She further clarified that the victim had used marijuana near the time of his death and likely used cocaine within the previous twenty-four hours prior to

death.

Sergeant Anthony Mullins with the Memphis Police Department Homicide Bureau responded to the crime scene location and was the case coordinator. He interviewed Kimberly Mayes and developed [the Petitioner] as a suspect. When he showed Mayes a photo of [the Petitioner], "she immediately broke down into violent sobbing, yelling-'That's him, that's him.' " Sergeant Mullins could not recall whether he asked for a gunshot residue test to be performed on the victim's hands. He explained, "there are occasions when hands are cleaned prior to the medical examiner's office obtaining the body. If that's the case, there's too much of a possibility for contamination. In this particular case, I didn't have any indication that [the victim] fired any shots . . ." He clarified on cross examination, "If I make the scene, and the body has already been placed in a bag at The Med, I can't-I'm not necessarily going to get the hands bagged [for gunshot residue testing]."

Sergeant Mullins also explained that, initially, he had another suspect who also had the first name "Derrick." However, he did not conduct any follow-up investigation on this person nor did he provide a picture of this individual in a photographic line-up for viewing.

The defense proof consisted of the following. In July 2004, Jackie Guy lived at 2105 East Raines. She testified that she telephoned the victim on the day of the offense. He came to her house accompanied by his girlfriend, Kimberly Mayes. Guy further stated that they parked at her backdoor "front-in." She described the following:

> I got-came over and got in the car, and we talked awhile, and I got out of the car, and I started waiving [sic] bye-bye like, "I'll see you later." I did glean someone going behind the garbage can, and as I went in the house-it wasn't sixty seconds later, and I heard like two or three gunshots, which I thought it was some firecrackers. And I heard a boom-I guess it was the car impound [sic], you know. I said, "What was that?" Then I hea[r]d two or three more gunshots. That's when I went to my backdoor, and I saw a lot of peoples running around the curb . . . and I saw [the victim] in the street.

Guy testified that the reason she got in the car was to buy some crack cocaine from the victim, Eric Mattison. She said she paid him $10.

8

[The Petitioner] testified that in July of 2004 he lived with his mother on Weaver Road in Memphis, Tennessee. He admitted that he had been previously convicted of various offenses including possession of a prohibited weapon, two felony convictions for theft of property, and criminal-attempt aggravated robbery. [The Petitioner] explained that on July 18, 2004, the day before the offense, he went to Lakeside Down Apartments. The confrontation began as [the Petitioner] was parked "like in the middle of the street" trying to get a girl's telephone number. The victim and Mayes pulled up in their car, Mayes asked [the Petitioner] to move his car, and [the Petitioner] attempted to comply. By the time he had straightened out his car, the victim had gotten out of his car, removed a firearm from the trunk his car, and threatened [the Petitioner] by saying "Yeah, Bitch, I think you need to move this car out the way." Although [the Petitioner] did not observe the caliber of the firearm the victim had, he described it as a small silver handgun. He identified the .25 caliber firearm recovered from the victim's vehicle on the day of the offense as the same firearm the victim had during this altercation.

[The Petitioner] said Mayes got out of the car and told the victim to get back in the car because it was "not that serious." At this point, [the Petitioner] observed another individual, possibly the victim's cousin, pull up in a brown van, blocking his way out of the apartments. [The Petitioner] testified that after the victim had a conversation with the person in the brown van, the brown van ultimately moved, and [the Petitioner] left the apartments. Later on that same night, [the Petitioner] said that someone in the same brown van fired five or six shots at him.

The next morning, [the Petitioner] had his uncle drop him off in the Lakeside Down Apartments. He said he was going to visit a girl who lived at 4180 Kostka. While he was waiting on the girl's porch, he observed the victim and Mayes's car. [The Petitioner] said the victim saw him, retrieved a firearm, and attempted to shoot him. He ran around the building and saw "somebody standing out there that [he] was familiar with" and asked for a "unit" or a gun. This person went inside a house, retrieved a gun, and gave it to [the Petitioner]. [The Petitioner] testified, "once I got the gun from him, I stuck the gun aside my waist. I didn't go get the gun with on my mind is, 'I'm fixin' to go do something to somebody.' I just wanted to protect myself and make it up out of those apartment complex safe without this person doing harm to me."

[The Petitioner] walked down Kostka Drive and attempted to leave the apartments. He saw Mayes and the victim in the car. Through the window,

he observed the victim "reaching for that firearm." He said he feared for his life and his safety, pulled a gun out, and fired three shots through the windshield of the car. He denied intending to hurt Mayes. After firing the gun, [the Petitioner] said the victim proceeded to get out of the car. [The Petitioner] ran back to the car and fired more shots into the victim's car. [The Petitioner] said the victim chased him as he ran out of the apartment complex. Although his statement to the police was not as detailed as his trial testimony, [the Petitioner] conceded that it was "about what [he] told them[.]"

On cross-examination, [the Petitioner] admitted that he signed his statement; however, he denied ever having read it. He explained that when he came to jail, he could not read. [The Petitioner] further stated that "it didn't take [the person who provided him with the gun] a matter of a second to come back out the door and give [him] that firearm. He went straight into the house. It's like he had a gun somewhere real close by."

Keith Dear, a friend of [the Petitioner's], corroborated [the Petitioner's] testimony regarding the events that occurred on the day before the offense. He was "just riding around" following [the Petitioner] in his car and talking to girls. He saw the victim get out of the car, open the trunk, and retrieve a gun. He said the victim was arguing with [the Petitioner], and they later left the apartments.

In July 2004, Earnestine Davison was employed with the Memphis Police Department Homicide Bureau. She spoke with Mayes as part of her role in the investigation of the victim's death. She recalled that Mayes told her that the she and the victim saw "Jackie" on the day of the offense. She also said that Mayes had previously advised that the victim had been laid off from his employment for a year.

*Johnson*, 2010 WL 3623619, at *1-7. The jury convicted the Petitioner of first degree murder and aggravated assault. The trial court imposed a life sentence for the first degree murder conviction, and a consecutive six-year sentence for the aggravated assault conviction, to be served in the Tennessee Department of Correction.

### B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief, claiming that he received the ineffective assistance of counsel when Counsel failed to object to a jury instruction on evidentiary matters related to a statement made by the Petitioner to law enforcement. The

post-conviction court held an evidentiary hearing and it heard the following evidence: Counsel testified that he practiced "general" law, but that he had begun practicing criminal law to a greater degree, and had recently begun helping with cases at the Public Defender's office. Counsel agreed that he represented the Petitioner during his first degree murder trial. Counsel testified that the trial court issued a jury instruction that the Petitioner's statement to police was "presented as a possible confession." Counsel agreed that the jury instruction did not mention the statement as "an admission against interest." When asked why he did not object to the jury instruction, Counsel said:

> "I can't tell you that. We tried the case in 2008, I believe, and I really don't recall thinking about it or dealing with it, but I've had occasions since it was raised in [the Petitioner's] amended petition to look at it again. I'm not sure today that I would object to [the jury instruction.] I just don't see the harm in the way the instruction was given."

Counsel testified that the defense presented at the Petitioner's trial was self-defense. In support of self-defense, the defense argued that the statement the Petitioner gave to police at the time of the offense was consistent with the Petitioner's truthful trial testimony. Counsel recalled that the Petitioner "did admit that he did it . . ." and that, although the Petitioner raised the issue of self-defense, he testified to all the elements of the crime. Counsel reiterated that he did not have a "tactical or strategic reason" for not objecting to the instruction, but that he "[didn't] consider it an issue."

On cross-examination, Counsel stated that reviewing the jury instruction with the benefit of hindsight, he would not raise an objection to the jury instruction now. Counsel stated that the Petitioner's written statement to the police was introduced and admitted into evidence, after his motion to suppress the statement was denied. Counsel recalled that the Petitioner testified at trial consistently with the written statement.

Based upon this testimony, the post-conviction court denied post-conviction relief.[1] It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because Counsel failed to object to the trial court's instruction to the

---

[1]The post-convictions court's order addressed multiple arguments laid out by the Petitioner in his petition; on appeal, the Petitioner assigns error only to Counsel's alleged failure to object to jury instructions, and thus, we will only address that portion of the order.

jury concerning the Petitioner's statement to the police. He contends that the jury instruction "confused the concepts of statement against interest and confession" and that the trial court effectively instructed the jury that, if they believed the Petitioner's statement was a confession, he was guilty of the crimes for which he was charged. The Petitioner argues that this amounted to "grossly prejudicial harm" to his case. The State responds that Counsel "took steps" to minimize the prejudice related to the jury instruction by objecting to the characterization of the Petitioner's statement as a confession, and that Counsel succeeded in having the instruction changed. The State contends that the Petitioner did not show deficient performance by Counsel or prejudice, and thus, the trial court properly denied the Petitioner post-conviction relief. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said

12

that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662,

13

665 (Tenn. 1994).

In its order denying the Petitioner relief on this issue, the post-conviction court pointed out that Counsel objected to referencing the Petitioner's statement as a "confession" and thus, the attorneys and the trial court agreed to substitute "possible confession" in the pattern jury instructions. The post-conviction court found that the Petitioner's statement to police could "well be characterized" as a confession, and that the jury instruction was proper given the contents of the Petitioner's statement.

The evidence in this case does not preponderate against the post-conviction court's findings on this matter. In the Petitioner's statement to the police, he admitted to using a handgun to shoot at the victim nine times. The post-conviction court's order notes that, in an off the record discussion between the trial court and the attorneys, Counsel suggested that the jury instruction not include the word "confession" when referring to the Petitioner's statement. The State countered that the statement was in fact a confession, and Counsel stated his preference to refer to the statement as a "possible confession." Ultimately, the agreement between the attorneys and the trial court was that the jury instruction would refer to the Petitioner's statement as a "possible confession." Counsel testified at the post-conviction hearing that he did not further object to the jury instruction because he did not think it was an issue, and that, if he could try the case again with the benefit of hindsight, he would not object. He also testified that in his judgment, the Petitioner's statement amounted to a statement that the Petitioner engaged in conduct consistent with the elements of the crime, which is a confession by definition. *See Helton v. State*, 547 S.W.2d 564 (Tenn. 1977). The post-conviction court, citing *Helton*, agreed that the statement could be characterized as a confession, and that given the facts of the Petitioner's statement, a jury instruction that the statement was a "possible confession" left it up to the jury as to how they considered the statement.

The Petitioner has not shown by clear and convincing evidence that Counsel's decision not to object further to the characterization of the statement is representation that falls below the standard of reasonableness. Accordingly, the evidence in the record does not preponderate against the trial court's finding that Counsel was not deficient in this respect. Thus, the Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied relief. Accordingly, we affirm the judgment of the post-conviction court.

14

_____
ROBERT W. WEDEMEYER, JUDGE